**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gwain COLLINS, Defendant–Appellant.**

**No. 91–1484.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1992.

Decided July 16, 1992.

**1216**

Mel S. Johnson, Chris R. Larsen (argued), Asst. U.S. Attys., Office of U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Anita Rivkin–Carothers, Chicago, Ill. (argued), for defendant-appellant.

Before EASTERBROOK and RIPPLE, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

Gwain Collins was tried with Marvin Smith for conspiring to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846. The jury convicted Collins and the district judge sentenced Collins to fifteen years imprisonment to be followed by a five-year period of supervised release.

Collins argues that this court should reverse his conviction for several reasons. First, Collins argues that there is insufficient evidence that Collins joined a conspiracy. Second, Collins argues that there is a prejudicial variance between the indictment, which alleged one conspiracy, and the evidence at trial, which evidenced multiple conspiracies. Third, Collins argues that the district court's improper jury instructions constituted plain error. And, finally, Collins argues that the prosecutor's misstatement of the law in closing argument substantially prejudiced his right to a fair trial. For the reasons stated below, we affirm Collins's conviction.

I.

The evidence at trial indicates that during the summer of 1987, Darryl Carter and Todd Thompson decided to take a trip from Milwaukee, Wisconsin to Los Angeles, California to meet with a man named Kevin Diggs. Carter lived in Los Angeles between 1972 and 1987, and in 1986 he began purchasing cocaine from Diggs for his personal use. Carter moved to Milwaukee, Wisconsin in the spring of 1987.

During the summer of 1987, Thompson needed a cocaine source, so Carter arranged for Thompson to meet with Diggs in Los Angeles. During this trip, Thompson purchased one-half kilogram of cocaine from Diggs for resale in Milwaukee. In the months following this initial meeting, Carter and Thompson made between four to eight additional trips to Los Angeles so that Thompson could purchase large amounts of cocaine. Carter testified that on each of these subsequent trips the amount of cocaine purchased escalated. And, at least one of these purchases was for as much as two kilograms of cocaine. Carter testified that on these trips the meetings and talks about the drug transactions took place at Diggs's house. Carter further testified that he saw Collins at Diggs's house on about one-half of these trips. During one of the trips to Los Angeles, Carter asked Diggs if he and Thompson could get "fronted" some cocaine, Diggs told Carter that he had some cocaine in Cleveland, Ohio that he would arrange for them to pick up. Two weeks later, Carter, Thompson, and Vincent Wynn, an associate of Carter, traveled from Los Angeles to Cleveland where a man known as "June" fronted them three kilograms of cocaine.

About one week after June fronted these three kilograms to Thompson, Diggs traveled to Milwaukee to collect his money for this delivery as well as other debts Thompson owed him. Collins accompanied Diggs on this trip. After Diggs and Collins arrived in Milwaukee, they met with Carter, Thompson, and Wynn at a Milwaukee nightclub. While at the nightclub, Wynn informed the group that June was in town. According to Wynn's testimony, both Diggs and Collins became visibly angry upon hearing that June was in town, and, in fact, Wynn testified that both Diggs and Collins said they were angered. According to Carter's testimony, Diggs was angry because he thought Thompson might be going behind his back and dealing directly with June.

Later that evening, Diggs and Collins met with Carter and Wynn at the Hyatt Regency Hotel in Milwaukee to discuss Thompson's debt to Diggs. These discussions culminated in Diggs placing a call to "uncle," codefendant Marvin Smith, in Detroit, Michigan and asking him to help collect the Thompson debt. The next day Smith arrived in Milwaukee. Smith and Diggs later visited Thompson and advised him that he should pay Diggs his money. Apparently, soon afterwards, Carter delivered approximately $80,000 in cash in a shoe box to Diggs on behalf of Thompson. Later in the fall of 1987, Carter flew to Los Angeles to bring Diggs another $80,000 in cash from Thompson. This brought a close to the relationship between Thompson and Diggs.

Wynn testified that Diggs had informed him that he could supply him cocaine for $15,000 per kilogram. And, in late 1987, Carter and Wynn took a trip to Los Angeles to discuss with Diggs the possibility of future cocaine transactions. About two weeks later Carter and Wynn again traveled to Los Angeles and bought one kilogram of cocaine from Diggs for $15,000.

Furthermore, sometime after Diggs told Wynn he could supply him cocaine at $15,000 per kilogram, Wynn testified that he told Jerome Mann, a man involved in the Milwaukee, Wisconsin drug trade, that he could get cocaine at such a price. This was a cheaper price than Mann could get from his Chicago, Illinois supplier. Wynn's testimony indicates that Mann expressed an interest in making large purchases at such a price and that Diggs likewise expressed an interest in large sales at such a price.

In order to help out with one of the deals in which Wynn acted as the middleman between Diggs and Mann, Carter travelled to Los Angeles and picked up a Chevy Blazer at Diggs's house with two suitcases loaded on top. Carter testified that in the presence of Collins, Diggs told Carter to call him at a certain telephone number when he got to Chicago. When Carter called Diggs, Diggs told him to meet him at "auntie's" house on the south side of Chicago. Diggs and Collins were both at auntie's house when Carter arrived. Carter apparently dropped off the suitcase and then checked in at the Westin Hotel in

Chicago. Later that same day, Wynn, Anthony Heard (Wynn's friend) and Craig Berry (one of Mann's associates) also arrived at the Westin with a suitcase containing $250,000 in cash. Later that day, Wynn took the money to Diggs's room where both Diggs and Collins were present. Heard went with Wynn to Diggs's room, but when they got to Diggs's room with the suitcase, Wynn asked Heard to go to the bedroom. At one point Heard testified that he opened the bedroom door for a period of five seconds. At that point Heard testified that he saw Diggs and Wynn counting money. Heard further indicated in this testimony that "Papa," defendant Collins, was there with Diggs and Wynn, but because Collins had his back to Heard, Heard could not see exactly what Collins was doing.

This was not the only transaction where Wynn bought cocaine from Diggs to sell to Mann. Rather, Wynn, Carter, Heard, and Berry each described in detail several other transactions where Wynn brokered large cocaine deals between Diggs and Mann. For example, Wynn testified about one transaction where Mann indicated an interest in 30 kilograms of cocaine. Wynn contacted and made arrangements for a purchase of this amount of cocaine. Diggs said he could have the cocaine in Chicago in a week. When Diggs got to Chicago he called Wynn, and, according to Wynn, Diggs told him to get the money together and come to Chicago. Wynn and Mann's people (Barry and "Willy") brought the money down to Chicago. Wynn testified that he and Heard travelled together to the Hyatt Regency in Chicago. After arriving at the Chicago Hyatt, Heard, Wynn, Craig, and Willy counted the money, and then Wynn went to another room in the Hyatt to meet with Diggs and Collins. Wynn testified that when he arrived he gave the money to Diggs, and after receiving the money Collins and Diggs counted the money in Wynn's presence. According to Wynn, after Collins and Diggs counted the money, Wynn testified that Diggs said that the cocaine was at his auntie's house on the south side of Chicago. At that point Wynn, Barry, and Willie each followed

Diggs and Collins to a restaurant around the corner from auntie's house. Then Diggs and Collins drove a black Blazer to auntie's house to pick up the cocaine. Wynn, Barry, Willie, and "June Bug" waited in the parking lot. Wynn testified that about fifteen minutes later someone else drove this same black Blazer back to this restaurant, handed Wynn a suitcase with the cocaine, and Wynn gave this suitcase to Barry and Willie who put it in their trunk and drove it back to Milwaukee.

Other witnesses also testified to this and other transactions in early 1988 that followed a similar sequence of events, including one other transaction where Wynn testified that he counted money with Collins, and where Wynn went with Collins and Diggs to auntie's house to get the suitcase filled with cocaine. Moreover, various witnesses also described a cocaine deal that transpired in Detroit, Michigan. Hotel records show that this drug transaction occurred between March 11, 1988, and March 15, 1988. Wynn, Heard, and Carter all testified that they traveled from Milwaukee to Chicago in two vehicles. When they arrived in Chicago they met with Diggs and Collins as usual, but later that night Diggs informed them that they would all have to travel to Detroit to consummate the transaction. According to Wynn, this transaction was for 37 kilograms of cocaine, 30 of which were to go to Mann with the remaining 7 going to Wynn.

Subsequently, all the participants drove from Chicago to Detroit in two separate vehicles where they met codefendant Smith, "uncle." The participants then checked into a Days Inn Hotel in Detroit. Carter stated that later on that day Carter's cousin, Carter, Heard, Wynn, Diggs, and Collins went to a restaurant where they met up with Smith. There is some discrepancy regarding the location of this restaurant; Carter testified that it was about an hour away in Toledo, Ohio, while Heard testified it was outside Detroit, Michigan. According to testimony, while at the restaurant, Diggs and Collins talked to Smith while the others ate. After everyone returned to Detroit, Carter testified

that he was awakened in the middle of the night. Carter testified that he then followed Wynn outside and Wynn, Smith, Carter, Heard, and Carter's cousin took two cars to some residence in Detroit. At that residence, Smith went into the house and came out with a suitcase that Wynn placed in Carter's cousin's car. Wynn then told Carter, Heard, and Carter's cousin to drive the car back to Milwaukee to deliver the cocaine to Mann, which they did.

Wynn testified that while Carter, Heard, and Carter's cousin were travelling back to Milwaukee with the cocaine, Wynn brought the money to a residence in Chicago where he met with Smith, Diggs, and Collins. While at this residence, Wynn testified that he, Smith, Diggs, and Collins counted the money.

In addition to the above testimony, phone records indicate that between March 1, 1988, and March 10, 1988, the ten days preceding the Chicago meeting, six calls were placed from Smith's mobile phone to Collins's number in Los Angeles and two calls were placed from Smith's residence to Collins's number. Furthermore, five calls were placed from Wynn's number to Collins's number.

In early 1989 the authorities arrested Wynn. After his arrest, Wynn agreed to cooperate with the authorities and to help the government set up an undercover transaction with Diggs. Wynn, in helping with this government sting, contacted Diggs in 1989 to arrange a drug deal. Diggs showed up in a Chicago hotel room in October of 1989 with five kilograms of cocaine, and the government seized the cocaine and arrested Diggs. Collins was arrested in February of 1990. At the time of his arrest, Collins was carrying $4,600 in cash, a regular pager, and a sky pager.

At trial Collins denied that he was involved in, or knowledgeable about, any cocaine conspiracy. He also denied counting money or participating in any of the cocaine dealings identified by witnesses. He admitted that he was with Diggs on many of the occasions that Diggs was in Chicago but stated that he was only along because he and Diggs worked together in the music business. He insisted that if Diggs was conducting cocaine transactions on any of these trips, he knew nothing about it.

## II.

### A. *Sufficiency of the Evidence*

■ To prove a conspiracy to distribute in excess of five kilograms of cocaine under 21 U.S.C. § 846, the government must show that (1) there was an agreement between two or more persons to distribute in excess of five kilograms of cocaine, and (2) the defendant was a party to this agreement. *See* 21 U.S.C. § 846; *United States v. Navarez,* 954 F.2d 1375, 1380 (7th Cir. 1992). Collins first challenges the sufficiency of the evidence on the second prong of this test. That is, Collins argues that there was insufficient evidence presented at trial to support the allegation that he was a member of a conspiracy to distribute cocaine. The critical inquiry when determining if there is sufficient evidence to establish a "participatory link" between the conspiracy and the defendant is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that "the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose." *Navarez,* 954 F.2d at 1381 (quotation marks and citations omitted). And, in *United States v. Durrive,* 902 F.2d 1221, 1228 (7th Cir.1990), we explained that substantial evidence is necessary to support a jury verdict that a particular defendant joined a conspiracy.

At oral argument Collins emphasized that the thrust of the evidence against him was that he was around during some of the discussions regarding the drug transactions and he helped to count money on a few occasions. Collins's position is that this is not substantial evidence supporting a verdict that he intended to join the conspiracy to distribute cocaine, but that this at most indicates that he aided and abetted in the drug dealings.

■ A person who is indifferent to the goals of an ongoing conspiracy does not

become a party to this conspiracy merely because that person knows that his or her actions might somehow be furthering that conspiracy. *See United States v. Townsend*, 924 F.2d 1385, 1392–93 (7th Cir.1991). Rather, a person becomes a member of the conspiracy when that person intends to join an agreement to carry out the criminal purposes underlying the conspiracy. *Id.* at 1390. As such, Collins correctly argues that if rational jurors could not *infer* from the record that Collins intended to join an agreement to distribute drugs, the fact that he knew about and may have even somehow assisted the conspiracy would not support the verdict. We emphasize, however, that direct evidence is not necessary to demonstrate that a person intended to join an agreement to distribute drugs. Rather, the jury can infer such intent from circumstantial evidence. *Id.* at 1390.

The record indicates that Collins was with Diggs during most of the drug dealings. For example, Collins was present for two to four of the incidents where Carter and Thompson drove to Los Angeles to purchase cocaine. Collins was with Diggs when Diggs travelled to Milwaukee to collect drug debts from Thompson. Moreover, testimony indicates that when Collins and Diggs got wind of the fact that Thompson might be buying from June, *both* Collins and Diggs said they were upset. This expression of anger indicates that Collins was more than a disinterested bystander to these transactions. To the contrary, this expression of anger indicates that Collins was interested in assuring the success of the illegal enterprise to sell drugs. Moreover, Wynn's testimony indicates that Collins may have been an active participant in conversations with regard to the collection of this Thompson debt. This is further evidence that Collins was interested in the success of these drug transactions with Thompson and that he joined in an agreement to achieve such objectives.

■ In addition, Collins was present during many of the meetings and exchanges of drugs and money with regard to the cocaine transactions that Wynn brokered between Diggs and Mann. For example, the testimony indicates that Collins was with Diggs when Carter picked up a Chevy Blazer loaded with suitcases apparently full of cocaine for delivery to Chicago. Moreover, Collins travelled with Diggs on a few occasions to "auntie's" house where drugs were picked up for eventual delivery. And, of course, Collins was present for several deliveries of suitcases full of hundreds of thousands of dollars of cash—cash delivered to pay for several large sales of cocaine to Mann. This court has previously emphasized that "a defendant's mere knowledge of, approval of, association with, or presence at a conspiracy standing alone is insufficient to establish membership in the conspiracy." *United States v. Burrell*, 963 F.2d 976, 988 (7th Cir.1992) (quotation marks and citations omitted). Nonetheless, continued presence during the transpiring of key overt acts in furtherance of that conspiracy is certainly probative and material evidence in reaching this decision. *Id.* And, in any event, Collins's involvement went beyond mere presence. Rather, several witnesses testified that Collins helped count suitcases filled with hundreds of thousands of dollars during several of these transactions. In addition, the record contains testimony indicating that Collins took an active role in the Detroit, Michigan transaction. Phone records indicate that in the days before this transaction Collins placed and received numerous calls to and from Smith and Wynn, two of the key coconspirators in this deal. Moreover, the testimony indicates that Collins participated in direct discussions with Smith, the cocaine supplier, hours before Smith and others made the drug pickup. And, again Collins helped with the money count after the cocaine exchange.

■ The cumulative effect of this circumstantial evidence constitutes substantial and sufficient evidence in support of the jury verdict that Collins was a participant in a conspiracy to distribute cocaine. This, however, does not dispose of Collins's argument that the evidence was insufficient to support a verdict against him because Collins not only argues that the record was insufficient to support a finding that he was a participant in any conspiracy,

but Collins also argues assuming *arguendo* he was involved in a conspiracy it was not the conspiracy charged in the indictment. In other words, Collins argues that there was a variance between the charges in the indictment and the proof presented at trial. Namely, Collins argues that the indictment alleged a single conspiracy, but the proof at trial indicated that there were at least three separate conspiracies, and Collins argues that he was, at most, a participant to one of these three conspiracies.

■ The district court instructions adequately informed the jury that it must find each defendant guilty of the conspiracy charged, a single conspiracy to distribute cocaine, in order to convict that defendant.[1] In cases such as this, where the jury was instructed on the variance issue, the defendant must demonstrate two things in order to obtain a reversal on a claim that the conspiracy charged varied from the conspiracy or conspiracies proved at trial: (1) the evidence presented at trial was insufficient to support the jury's determination that the government proved the alleged conspiracy, and (2) that any variance between the conspiracy charged and the conspiracy or conspiracies proved prejudiced the defendant. *United States v. Paiz*, 905 F.2d 1014, 1019 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991) (quoting *United States v. Mealy*, 851 F.2d 890, 895, 897, 898 (7th Cir.1988)); *Townsend*, 924 F.2d at 1410.

■ Collins argues that the record demonstrates three conspiracies, one which we will only for convenience call the Thompson–Diggs conspiracy, one which we will call the Diggs–Wynn conspiracy, and one which we call the Wynn–Mann conspiracy. The Thompson–Diggs conspiracy, according to Collins, involved an agreement centered around Diggs's cocaine sales to Thompson. According to Collins, the Diggs–Wynn conspiracy was the agreement centered around Diggs and Wynn, where Wynn agreed to purchase large quantities of cocaine from Diggs. And, according to Collins, the Wynn–Mann agreement, was the agreement centered around Wynn and Mann, where Wynn agreed to sell large quantities of cocaine to Mann.

As this court emphasized in *Townsend*, it is often very difficult to determine the parameters of an agreement when dealing with drug distribution chains. And, in that case we emphasized that the mere fact that various links of a drug distribution chain have some general knowledge that the people they are dealing with will use and possibly distribute the drugs illegally is not, alone, enough to prove that these various links have joined in one agreement to distribute drugs. *Townsend*, 924 F.2d at 1390–93. In drawing such a conclusion, we explained a conspiracy is essentially a business enterprise with illegal purposes, and we further explained that illegal enterprises like legal enterprises are characterized by cooperative relationships between its members. *Id.* at 1394–95. For this reason, the existence or nonexistence of such cooperative relationships informs the conspiracy analysis.

First, we address Collins's argument that there were two separate agreements with regard to the drug sales to Mann: one involving an agreement to sell drugs to Wynn, of which we already indicated Collins was a party, and Wynn's agreement to distribute drugs to Mann, of which Collins argues he was not a party. *Townsend* involved numerous individuals who supplied drugs to a few key players and these key players then, in turn, sold these drugs to various purchasers. The jury in that case held that all these individuals had entered into one agreement to sell drugs,

---

1. The following instruction was given to the jury:

 If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that defendant. In other words, to find a defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some other conspiracy. On this point you should consider that the overall membership of a conspiracy may change from time to time but a single conspiracy is not divided into multiple conspiracies merely because new parties join the agreement while others may terminate their relationship with the conspiracy.

and we held that without evidence that the suppliers at the one end of the chain had any interest or stake in the dealings of the purchasers at the other end of the chain, and vice versa, and in light of the fact that the various individuals were in a competitive situation rather than a cooperative operation, the loose associations between the suppliers and the purchasers were not sufficient to support a finding that all these individuals had entered into a single agreement to distribute drugs. However, in this case, unlike *Townsend*, the associations between the players on the supplier side, Diggs and Collins, and the key buyer, Mann, evidence a cooperative association with a common goal—the distribution of large quantities of cocaine. And, unlike *Townsend*, this is not a case involving a middle man who bought drugs from various suppliers and then later made various arrangements with numerous purchasers to sell portions of these drugs. Rather, this case involves numerous, prearranged deals for the sale of anywhere from $250,000 to $480,000 worth of cocaine to one person, Mann (with the middleman, Wynn, sometimes keeping a small portion for himself). Moreover, we note that these were not sporadic transactions, rather the record indicates that there were several large scale sales to Mann over a period of months, with each sale involving a similar sequence of events. Furthermore, although Diggs and Collins did not deal directly with Mann, Diggs and Collins dealt with Mann's agents, Willie and Berry, during the drug deliveries. This is all evidence that these sales were more than separate market transactions and instead that there was an implicit cooperative arrangement between Diggs, Collins, and Mann. Indeed, Wynn's testimony that Diggs sometimes fronted cocaine to Mann, meaning that Mann bought the cocaine on credit, further evidences a cooperative arrangement where Diggs, Collins, Mann, and others were acting as a single economic unit. Therefore, even if we assume that Diggs and Collins were never directly informed that Mann was the buyer (a point not clearly resolved by the record), a rational juror could infer from the fact that these regular, large scale transactions followed a similar pattern of events with delivery to the same individuals that Collins and Diggs had a large stake in the success of the sales to Mann and that Collins and Diggs entered an agreement to accomplish these sales.

Now it is admittedly less clear under *Townsend* whether a rational juror could find that the agreement to distribute cocaine through Wynn to Mann was the same agreement that was involved in the distribution of drugs to Thompson. But, as to Collins, whether the agreement to sell to Thompson was separate from the agreement to sell to Mann, is a point without a difference. This is because Collins's presence at the scene of the cocaine transactions with Thompson; the fact that he travelled with Diggs from Los Angeles, California to Milwaukee, Wisconsin on a trip that Diggs took in order to collect drug debts from Thompson; Collins's concern when it looked as though Thompson might be buying from June rather than Diggs; and Wynn's testimony suggesting that Collins may have been an active participant in the conversations regarding the collection of the Thompson money, support a jury verdict that Collins entered into an agreement to distribute cocaine to Thompson. This means that Collins could have been joined at trial with the same defendants; the same coconspirator statements would have been admissible against Collins; and Collins's vicarious liability would have been the same whether or not the agreement to sell to Thompson was part of a larger agreement, which included the distribution of cocaine to Mann. And, for these reasons, Collins has failed to demonstrate that he was prejudiced by any potential variance between the indictment and the evidence at trial in this regard.

## B. *Jury Instructions*

Collins next alleges that the district court failed to properly instruct the jury. However, because Collins's trial counsel failed to object to the wording of the instructions or offer alternative instructions at the time of trial, we must find plain

error to reverse on the basis of faulty jury instructions. Under this plain error standard, we will only reverse a criminal conviction if we are convinced that reversal is necessary to avoid an actual miscarriage of justice. *United States v. Torres*, 965 F.2d 303, 307 (7th Cir.1992). In *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir.1988), this court indicated that in order for an error to result in an actual miscarriage of justice, the error "must be of such a magnitude that it probably changed the outcome of the trial." Moreover, in determining whether an improper jury instruction resulted in plain error, "we consider the instructions as a whole in light of the facts of the case and the evidence presented." *Torres*, 965 F.2d at 307.

In *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct. 2775, 2778–79, 97 L.Ed.2d 144 (1987), the Supreme Court held that a judge can, without offending the Sixth Amendment's Confrontation Clause, consider another person's out-of-court statements in determining whether these statements are admissible as coconspirator statements under Rule 801(d)(2)(E) of the Federal Rules of Evidence. We explained in *United States v. Nichols*, 910 F.2d 419, 421 (7th Cir.1990), that under *Bourjaily* out-of-court, coconspirator declarations, therefore, become the predicate for the admission of the statements themselves. In *United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991), this court in an *en banc* decision discussed what use the jury could make of these hearsay statements once admitted. That determination required an evaluation of substantive conspiracy law and Rule 104(b) of The Federal Rules of Evidence. In *de Ortiz* we indicated that under Rule 104(a) of the Federal Rules of Evidence it is the judge's role to determine admissibility of evidence, and the jury should not second-guess these determinations, and we concluded that an instruction informing a jury that they could only consider the facts and statements of that particular defendant conflicted with this notion. *Id.* at 632–34. We further concluded that although the jury could not second-guess the judge's determination that this evidence was admissi-

ble, substantive conspiracy law and Rule 104(b) affect the appropriate use of this information. In this regard, we noted that once a jury finds that a defendant is a member of a conspiracy, then the statements of coconspirators are admissible against the defendant for purposes of demonstrating vicarious liability. *Id.* at 635. However, this is a matter of conditional relevance, because such statements are only relevant for purposes of vicarious liability if the defendant is, in fact, a member of that conspiracy, and, under Rule 104(b), the jury makes the underlying determination of whether the defendant was a member of that conspiracy. And, more important to the issues in this case, we also concluded in *de Ortiz* that under the substantive law of conspiracy membership depends on the accused's own acts and words, and, therefore the jury in determining whether a particular defendant joined a conspiracy should only use other persons' out-of-court statements to help it to understand "what the accused did or said, or to help the jury understand the significance of ambiguous acts or words." *Id.* at 635. Because the law imposes these limitations on the relevancy of such out-of-court statements, we stated in *de Ortiz* that the judge ought to help the jury understand these limitations, and, in that case we *suggested* that the following instruction would suffice:

> During the trial you heard about statements made by persons who the prosecutor says are the defendant's fellow conspirators. You may consider these statements when you decide whether the defendant joined the conspiracy. Please remember, however, that only the defendant's own words and acts show whether he joined. You therefore should use statements by other persons to decide what the defendant did and said, or to help you understand the defendant's acts and words. If you decide that the defendant joined the conspiracy, you may use the statements by other persons in order to decide questions that are pertinent to the other accusations against him.

*Id.*

The parties today dispute whether the judge adequately instructed the jury with

regard to *de Ortiz*'s holding that in deciding if a defendant joined a conspiracy, the jury can only look to other persons' out-of-court statements to determine what the defendant did or said. The district court gave the following instruction in this case:

A conspiracy is a combination of two or more persons to accomplish an unlawful purpose. A conspiracy may be established even if its purpose was not accomplished. In determining whether the alleged conspiracy existed you may consider the actions and statements of all the alleged participants. To be a member of a conspiracy a person need not join at the beginning or know all the other members or the means by which the purpose of the conspiracy was to be accomplished. The government must prove, however, beyond a reasonable doubt, that a defendant was aware of the common unlawful or illegal purpose and that he was a willing participant in the venture.

The government argues that the above instruction adequately conveys the message of *de Ortiz*, and that this instruction is, in fact, preferable to the *de Ortiz* instruction. We do not agree that this instruction is preferable to the instruction suggested in *de Ortiz*, nor do we agree that this instruction would necessarily suffice if we were not bound by the plain error standard in this case.

 As we explained above, the government must prove there was an agreement between two or more persons to distribute cocaine and that the defendant was a party to the agreement in order to sustain a conviction for such a conspiracy. The instruction given in this case provided the jury specific guidance as to the use of out-of-court statements to prove the first element, but it provided no specific guidance as to the limits on the use of these statements in deciding whether the government has proved that the defendant participated in the conspiracy. The government argues, nonetheless, that the instruction given was preferable to the instruction suggested in *de Ortiz* because the *de Ortiz* instruction is confusing. We first emphasize the precise wording of jury instructions is a matter left to the discretion of the district court.

*United States v. Penson*, 896 F.2d 1087, 1090 (7th Cir.1990). This does not mean, however, that a court can choose not to give the jury any specific guidance as to an important legal principle set forth in *de Ortiz* just because this a confusing area of the law. Indeed, it is exactly because the use of out-of-court statements in the conspiracy context is a confusing area of the law which makes such guidance necessary. It is the court's job to adequately instruct the jury on the law, and the jury's job to apply the facts to that law. We cannot expect the jury to figure out, without guidance, what legal standards apply to the case before it, and we therefore do not understand the government's suggestion that because, in the government's view, the *de Ortiz* instruction is confusing, it is better to leave the jury without specific guidance on the legal principles underlying that decision.

 Although we disagree that the district court instruction, which gave no specific guidance as to the appropriate use of out-of-court statements in determining if a defendant joined a conspiracy, was preferable to a more specific instruction, we are reminded that under the plain error standard we must look to the instructions as a whole in order to determine whether the jury was given adequate guidance to avoid an actual miscarriage of justice. We find *Torres*, a recent decision by this court, instructive on this matter.

In *Torres*, like in this case, the district court failed to specifically instruct the jury that in determining whether a defendant joined a conspiracy it should look to other persons' out-of-court statements only to determine what the defendant did or said. But, in that case, the judge had informed the jury that "[e]ach defendant is entitled to have his case determined from his own conduct." *Torres*, 965 F.2d at 309. Moreover the judge in that case instructed the jury that it must give each defendant separate consideration. *Id.* at 308. In *Torres*, after looking to these instructions and the evidence as a whole, we concluded that there was no plain error.

Likewise, in this case the instructions as a whole provided the jury with some indication as to the appropriate use of other persons' out-of-court statements in determining whether a defendant joined a conspiracy. First, we note that the above quoted instruction specifically informed the jury that it must find that the defendant was a willing participant in the conspiracy. Moreover, the district court informed the jury that each defendant should be considered separately. These two instructions gave the jury some hint that in deciding whether a defendant joined a conspiracy a juror should focus on whether the defendant's acts and words indicated a willingness to join that conspiracy, leading to the inference that any hearsay statements should only be used to evaluate the defendant's acts and words. And, the following instruction, which emphasizes that other persons' out-of-court statements should be treated differently *after* the jury has determined that a defendant joined a conspiracy, further bolsters this suggestion:

> [i]f the jury finds beyond a reasonable reasonable [sic] doubt that persons are members of the same conspiracy then statements by one of such persons which are made in furtherance of the conspiracy and during the course of the conspiracy constitute statements of each of the other persons found to be members of the conspiracy.

Furthermore, we note that coconspirator, out-of-court statements do not constitute the bulk of the case against Collins. Rather, evidence of Collins's continued presence during the deliveries of cocaine, the transfer of money, the counting of money, phone records, and the indication that Collins, himself, expressed that he was angry about Thompson's associations with June [2] all constitute evidence of Collins's willingness to join one or more agreements to distribute drugs. Considering this evidence and the fact that the judge's instructions gave *some* guidance as to the appropriate use of hearsay in determining wheth-

er a defendant joined the conspiracy, we cannot say the judge's instructions resulted in plain error.

Collins also challenges another jury instruction. Nonetheless, once again, Collins's counsel failed to object to this instruction at trial. And, again, we can only reverse if we find plain error.

This second challenged instruction reads as follows:

> Your verdict in this case must be the considered judgment of each of you and your verdict as to either defendant, whether it be guilty or not guilty, must be unanimous. The defendants are being tried together, although they are entitled to separate consideration, and you *should* give separate consideration to each defendant during your deliberations.

(Emphasis added).

Collins's primary challenge to this instruction is that the court used the word "should" rather than the word "must." Although, instructing that a jury must give separate consideration to each defendant is preferable, we cannot say that the use of the word "should" distorts the import of this instruction in such a manner that it results in plain error.

### C. *Closing Argument*

Collins's final challenge on appeal is that the Assistant United States Attorney made an improper argument to the jury during closing argument. Because Collins's trial counsel failed to make an objection to this argument, we must review Collins's allegation for plain error. The prosecutorial argument to which Collins objects reads as follows:

> Mr. Guenther made the argument that, well, at most the evidence here just shows Gwain Collins counted money. Well, if that's so he's guilty. Like I said at the beginning, he doesn't have to have a certain role, he doesn't have to be the leader of this, he doesn't have to have

---

**2.** Wynn did not directly testify that Collins stated he was angry as a result of the fact that Thompson was with June. But, this is a situation where Wynn's out-of-court statement that

Thompson was with June helps us to understand Collins's expression of anger—a permissible use of an out-of-court statement under *de Ortiz.*

done X, Y, Z. All he has to do is be aware of the common purpose and be a willing participant. If he counted money in any of these transactions he's guilty.

When reviewing for error, we must remember that the function of closing argument is to allow counsel for each side to put forth that side's best case. And in doing so, counsel is permitted to suggest factual inferences and to argue how the law applies to these facts. When we look to the above argument of the Assistant United States Attorney, it appears that the attorney was essentially arguing that the jury could infer an intent to join a conspiracy from the mere fact that Collins counted money. And, even if counting money, alone, might not be sufficient to support such an inference, we cannot say that the Assistant United States Attorney stepped over the bounds of what constitutes a proper closing argument. And, in any event, we have already indicated that there was other evidence on which the jury could rely in reaching its verdict against Collins, meaning, even if improper, this argument did not result in plain error.

## CONCLUSION

For the above reasons, we affirm Collins's conviction.