UNITED STATES of America,
Plaintiff–Appellee,

v.

David SEVERSON and John Steele,
Defendants–Appellants.

Nos. 92–3818, 92–3836.

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1993.

Decided Aug. 16, 1993.

As Corrected Aug. 18, 1993.

Robert Anderson, Asst. U.S. Atty., argued, Madison, WI, for plaintiff-appellee in Nos. 92–3818 & 92–3836.

Charles W. Giesen, Morris D. Berman, argued, Giesen & Berman, Madison, WI, for defendant-appellant in No. 92–3818.

David E. Lasker, argued, Julian, Olson & Lasker, Madison, WI, for defendant-appellant in No. 92–3836.

Before BAUER, Chief Judge, CUDAHY, and KANNE, Circuit Judges.

BAUER, Chief Judge.

. A jury convicted David Severson and John Steele of conspiracy to possess marijuana with the intent to distribute. 21 U.S.C. § 846. The district court sentenced each defendant to 87 months imprisonment followed by four years supervised release. We affirm their convictions, and affirm their sentences in part. We remand a portion of their sentences so that the district court may conduct further proceedings to evaluate new evidence and its possible affect on the sentencing increase for obstruction of justice and denial of a reduction for acceptance of responsibility.

I.

Debra Gahring was driving on an Arizona highway en route to Madison, Wisconsin on October 30, 1991. She and another woman were transporting 170 pounds of marijuana intended for distribution in the dairy state.

Gahring was pulled over by a state trooper, who discovered the goods. She told the trooper that the marijuana came from a source in Mexico. She also told him about her trip, and agreed to cooperate with the authorities. (Tr. v. 13 p. 28). Federal agents were called in, and they decided that Gahring should complete the trip to Madison, but instead of her passenger, they decided she should be accompanied by a Drug Enforcement Administration ("DEA") agent. (Tr. 2–A–17).

This was not the first time that Gahring had made the marijuana run to Wisconsin. She had made six previous trips between December 1990 and September 1991. (Tr. v. 13 p. 6–26). Those six runs involved increasing quantities of marijuana, ranging from 20 pounds in 1990 to 80 pounds in September 1991. The amounts increased because her Wisconsin connection, Thomas Kaltenberg, indicated he could distribute more marijuana than the amount she had been providing. (Tr. v. 13 p. 27). Madison police estimated that Gahring transported more than 400 pounds of marijuana during that time. (Tr. 3–B–32). On the final run, which lead to her arrest, Gahring transported more than double the amount of the most recent load of marijuana.

Typically, when Gahring arrived in Madison, she rented a motel room and called Kaltenberg. Kaltenberg would contact other distributors, and they would meet to break the marijuana into smaller packages for later resale. In the three runs prior to the arrests, the marijuana was taken to Steele's farmhouse for this purpose. (Tr. 3–A–9–36). On the final run, Gahring followed the usual drill, checked into a motel and called Kaltenberg. Later, she and the agent met with him at the motel room, where they discussed the marijuana transaction. (Tr. 2–A–21). The meeting among the agent, Kaltenberg, and Gahring was recorded. (Govt.Exh. 2). Usually when Gahring delivered the marijuana, she allowed the Wisconsin distributors to sell it and then pay her from the proceeds. This time, however, Gahring and the agent told Kaltenberg that they had to collect the mon-

ey upfront. Kaltenberg balked at the change, but stayed in the deal. The next day Kaltenberg called Gahring at the motel. (Govt.Exh. 3). In that conversation, Kaltenberg told Gahring he was going to meet "Dave" at a specified time and that they would discuss the marijuana transaction. Surveillance on Kaltenberg's house revealed that David Severson went to Kaltenberg's house at the specified time. Agents followed Severson when he left Kaltenberg's home and tailed him as he drove to Steele's house. (Tr. 3–B–36–38).

After meeting with Severson, Kaltenberg went to Gahring's hotel room to examine the marijuana. He was arrested after negotiating to buy the marijuana; 10 pounds for himself, and 50–60 pounds for "Dave". (Tr. 2–A–31). When he was arrested, officers seized a duffel bag containing a triple beam scale and zipper-lock plastic bags. (Tr. 2–A–33). Kaltenberg agreed to cooperate with the agents. He called Severson, and then put the agent on the telephone to discuss the marijuana deal. (Govt.Exh. 7). They arranged to meet at a local bar to discuss the transaction further. At the bar, Severson tried to negotiate a delivery of 50 pounds of marijuana without fronting the money. To assuage the agent's fears that she would never be paid, Severson told her that he had three or four customers that he had dealt with for years and whom he trusted. He told the agent that the customers could be counted on for money. (Tr. 2–A–41 & 42). Severson was arrested shortly after this conversation. Like Kaltenberg and Gahring, Severson agreed to cooperate with the agents. He told Madison Police Sergeant Mark Bradley that he was to make sure that approximately 30 pounds of marijuana was delivered to another individual at a different location. (Tr. 3–B–49).[1] Severson also acknowledged his earlier telephone conversation with Kaltenberg in which they arranged the time and place to deliver the marijuana. (Tr. 3–B–51).

Severson called Steele to discuss the shipment and the need to pay for the marijuana upfront. This call was also recorded. (Tr.

---

1. The individual was John Steele, although Steele's name was not given to the jury in light of

*Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

2–A–34). Steele was peeved that Gahring and the agent were demanding money instead of fronting the marijuana as Gahring had done in the past. He asked about "Tom and the other one", meaning Kaltenberg and the undercover DEA agent. Steele suspected the agent of being a cop, but told Severson to bring her to his house, where he could talk to her himself. Severson brought more than the undercover agent. He also brought several members of the law enforcement community to the house, who arrested Steele. (Tr. 2–A–44). Inside the house, officers seized a triple beam scale and a box of gallon-size plastic bags. (Govt.Exh. 8/8A).

Steele began cooperating with the authorities after his arrest. He told Sergeant Bradley that he had three to five customers and that three of those customers had been told that the marijuana shipment had arrived. Steele also told Bradley that two of the three customers were his, and the other "belonged" to Severson. (Tr. 3–B–57). Further arrests were made when the "customers" came to Steele's house to buy marijuana. (Tr. 3–B–58–76).

Gahring, Kaltenberg, and other defendants pleaded guilty. Steele and Severson stopped cooperating and chose to stand trial. They were tried before a jury, and convicted on the counts charged in the indictments. When sentencing them, the district court increased their sentences for obstruction of justice based on contradictory testimony they delivered at the pretrial hearings and at the trial. (Testimony Abstracts, Dkt. 136 & 137). The court also denied their motions for reductions in their sentences for acceptance of responsibility.

Steele and Severson appeal their convictions and sentences. First, they challenge the district court's denial of their request for a multiple conspiracy jury instruction. Second, they challenge the quantity of marijuana that the district court attributed to them when calculating their sentences. Third, they challenge the denial of a decrease in their sentences for acceptance of responsibility for the crimes, and they challenge the increase in their sentences for obstruction of justice. The defendants also raise separate challenges. Steele argues that his due pro-

cess rights were violated because he received an unusually harsh sentence because he opted for a jury trial. He also argues that his sentence should be reduced because he was a "minor participant" in the conspiracy. Severson argues that the government committed prosecutorial misconduct because the assistant United States Attorney improperly vouched for the credibility of one of the witnesses.

## II.

### A. The Joint Claims:

#### 1. Multiple conspiracy claims:

■ Steele and Severson claim that the district court improperly denied their tendered "multiple conspiracy" jury instruction. They argue that the instruction should have been given because the evidence at trial did not establish the overarching conspiracy charged in the indictment. The defendants did not present any proof at trial of separate conspiracies but they rely instead on the government's evidence. Severson argues that the evidence shows only that he conspired with Kaltenberg. (Severson Brief at 16–19). Steele argues that the evidence shows only that he conspired only with Severson, or with Severson and Lysa Wisland, a Severson customer. They argue, therefore, that the conspiracy charged is at variance with the conspiracy proved at trial. (Steele Brief at 32–35).

■ A variance occurs only when the proof adduced at trial is not enough for a reasonable jury to find beyond a reasonable doubt that a single conspiracy existed, but rather, that multiple conspiracies existed. *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991). A defendant's conviction must be reversed only if the variance between the indictment and the proof affected the defendants' substantial rights. *United States v. Marshall*, 985 F.2d 901, 906 (7th Cir.1993). If the proof at trial shows that the defendants participated in both the conspiracy charged in the indictment and a different, "varying" conspiracy, the variance is harmless and will not result in reversal. *Id.* at 907. A variance challenge to multiple

conspiracies is similar to a challenge to the sufficiency of the evidence of proof that the defendants participated in the single conspiracy. *Townsend,* 924 F.2d at 1389.

We look to *United States v. Curry,* 977 F.2d 1042, 1052 (7th Cir.1992), for guidance. There, the defendants' challenge to their convictions was "styled as an allegation that the evidence at trial showed only multiple conspiracies, not a single conspiracy, and that there was a fatal variance between the indictment and proof ... they assert as unlawful the district court's decision not to give a multiple conspiracy instruction." *Id.* We rejected the defendants' argument and stated that the lack of multiple conspiracy jury instruction was just one of several factors to consider when determining if a defendant received a fair trial. We held that a defendant must be prejudiced by the variance before reversal is warranted. We determined that the defendants in *Curry* were not prejudiced by the district court's decision not to instruct the jury on multiple conspiracies because the evidence was sufficient to establish a single, overarching conspiracy. *Id.* at 1053. The *Curry* opinion limited our ruling in an earlier case that stated " 'if the possibility of multiple conspiracies exists, the trial judge must so instruct the jury.' " *Id.* at 1052 (discussing *United States v. Kendall,* 665 F.2d 126, 136 (7th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982)).

The defendants' claim here is the same as the defendant's claim in *Curry.* As in that case, the evidence here showed the defendants embraced the criminal objective of the conspiracy. At trial, several witnesses testified to Steele's and Severson's participation in the marijuana distribution network, and the evidence was clear that Gahring and Kaltenberg were the sources of the marijuana. Wisland, one of Severson's customers, testified to buying marijuana packaged in Ziploc bags at Steele's home on several occasions. She also testified that Severson told her that the marijuana originated in Mexico or Arizona. (Tr. 4–A–33–57). Gahring and Kaltenberg testified that both men met with them on previous occasions to divide marijuana and then resell it. (Tr. 3–A–10 & v. 13 p.

12) In addition, the nature of the "fronting" transactions that had occurred in the past and which Steele and Severson expected to be repeated revealed that the men shared a trusting relationship with Gahring. This type of co-operative relationship may support the premise that the defendants belonged to the overarching conspiracy. *United States v. Lechuga,* 994 F.2d 346, 354–355 (7th Cir. 1993) (*en banc*) (the existence of a continuing relation implies an agreement with an objective beyond a simple buy-sell agreement). *See Townsend,* 924 F.2d at 1395 and cases cited therein; *see also United States v. Collins,* 966 F.2d 1214, 1221–24 (7th Cir.1992) (cooperative relationships and transactions with similar sequence of events support overarching conspiracy theory rather than theory of separate, multiple conspiracies). The periodic deliveries from Gahring indicated an ongoing business among her, Kaltenberg, and the defendants. Prolonged cooperation that makes the illicit enterprise possible infers a conspiracy. *Townsend,* 924 F.2d at 1395 (citing *Direct Sales Co. v. United States,* 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943)). Moreover, the tape-recorded conversations also support the single conspiracy theory. A reasonable jury could determine that Steele and Severson participated in the overarching conspiracy. *United States v. Mealy,* 851 F.2d 890, 897 (7th Cir. 1988). The denial of their multiple conspiracy instruction was not reversible error.

■ Defendants argue another theory to support their claim that they should have received a multiple conspiracy instruction. They claim that multiple conspiracies were their theories of defense. Despite this argument, neither defendant offered proof of separate conspiracies at trial. In addition, the defendants never specifically identified their theory of defense during the jury instruction conference with the district court. The record is not clear as to whether such a defense was argued directly to the jury or merely implied through the defendants' approach to the case. Instead, they argue that the jury could have interpreted the government's evidence as revealing multiple conspiracies. Their claim is that it was unnecessary for them to make a separate showing of multiple

conspiracies because the government's evidence was all that was necessary to show multiple conspiracies. (Tr. 5–A–59).

■ The defendants were entitled to a "theory of defense instruction" on multiple conspiracies if: 1) the proposed instruction was a correct statement of the law; 2) the theory of defense was supported by the evidence; 3) their multiple conspiracy theory was not a part of the government charge; and 4) without the instruction they were denied a fair trial. *United States v. Casanova*, 970 F.2d 371, 375 (7th Cir.1992). Without hashing out the propriety of the defendants' "stealth" technique in presenting their defense, we can resolve this issue by deciding whether the jury instructions as a whole denied the defendants a fair trial. *United States v. Grier*, 866 F.2d 908, 932 (7th Cir. 1989).

If the instructions treated the conspiracy issue fairly and adequately, we will not disturb them. *United States v. Young*, 997 F.2d 1204, 1208 (7th Cir.1993). Our review of the jury instructions reveals that they accurately reflected the law and appropriately addressed the issues raised at trial. The jury was instructed on all the essential elements of the crime charged in the indictment, and was also instructed that the evidence must be weighed against each individual defendant, and that each defendant was guilty only if the evidence proved beyond a reasonable doubt that he committed the crime. Moreover, the jury was instructed of the distinction between a buy-sell agreement and membership in the overarching conspiracy. Steele and Severson received a fair trial without a multiple conspiracy instruction.

*2. Quantity of marijuana:*

■ The district court determined that 100–400 kilograms of marijuana was attributable to both Steele and Severson, and used this amount to compute their sentences. Steele and Severson claim that the district court erred in its quantity calculation. The district court must determine the appropriate quantity by a preponderance of the evidence. *United States v. Fowler*, 990 F.2d 1005, 1006 (7th Cir.1993). We review the district court's determination for clear error. *United States*

*v. Johnson*, 997 F.2d 248, 254 (7th Cir.1993). We will reverse only if we have a definite and firm conviction that a mistake in sentencing has been made. *United States v. Cojab*, 978 F.2d 341, 343 (7th Cir.1992).

■ The quantity of marijuana that may be attributed to a defendant is that amount which he knew, or reasonably should have anticipated, was involved in the conspiracy. *United States v. Edwards*, 945 F.2d 1387, 1392–97 (7th Cir.1991), *cert. denied sub nom.*, *Martin v. United States*, ―― U.S. ――, 112 S.Ct. 1590, 118 L.Ed. 2d 308 (1992). The . defendants argue that there was no way they could have reasonably anticipated that Gahring would bring a 170 pound shipment. Also, Steele claims that he was only responsible for portions of the shipments, and the evidence shows that these portions totaled a mere 14 pounds of marijuana. He also argues that his "modest" financial circumstances contradict his intent or ability to sell 100 kilograms (or more) of marijuana.

■ As for Severson, the district court found that it was reasonably foreseeable that a large shipment might follow because Gahring was transporting increasingly large quantities of marijuana to Kaltenberg, Severson, and Steele. (Sent.Tr. at 17). In addition, the district judge also stated that she believed Kaltenberg's testimony that he had discussed the 170 pound shipment with Severson. (Sent.Tr. at 18). This is enough to support Severson's sentence.

■ With regard to Steele, the district court stated that the marijuana that was attributable to Steele would be calculated only from May 1991, the date that the evidence reflected Steele's participation in the conspiracy began. The evidence clearly links Steele to the 170 pound shipment, as well as the three prior shipments. Moreover, the district judge stated at the sentencing hearing that she believed Steele could have reasonably foreseen a total of approximately 320 pounds of marijuana being moved in the conspiracy. The evidence supports this theory: Gahring testified that she brought 210 pounds of marijuana (V. 13 p. 16, 18, 21) during Steele's participation in the conspiracy. Matched with the final 170 pound ship-

ment, Steele is well over the 100 kilogram (220 pound) amount that sets the low end of his sentencing range. (Sent.Tr. at 19). Finally, Steele's argument about his financial condition is disingenuous. The evidence showed that Steele was not required to pay for the marijuana upfront, but rather, he sold the marijuana on consignment. This system of payment punches an irreparable hole in Steele's claim that he could not afford to deal large quantities. *Fowler*, at 1007. The district court did not err when it attributed more than 100 kilograms of marijuana to Steele during the course of his participation in the conspiracy.

*3. Acceptance of responsibility and obstruction of justice:*

■■■■ Steele and Severson appeal the district court's denial of their request for a reduction in their sentences for acceptance of responsibility and the increase in their sentences for obstruction of justice. The obstruction of justice finding arises from the district court's decision that the defendants lied at the pretrial hearing. The court's decision was based on what it believed to be contradictory testimony delivered at trial. Typically, perjury will justify an increase for obstruction of justice, a decision that must be set out in a separate and clear finding. *United States v. Dunnigan*, — U.S. —, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993). The district court's decision will be affirmed unless it is clearly erroneous. *United States v. Dominguez*, 992 F.2d 678, 685 (7th Cir.1993). Denials of conduct later found to have occurred will also defeat a sentencing decrease for acceptance of responsibility. *United States v. Cedano–Rojas*, 999 F.2d 1175, 1182 (7th Cir.1993).

■■■■ Our review of these arguments is difficult because on the day of oral argument, the defendants filed motions asking this court to take judicial notice of a letter they received from the assistant United States Attorney ("AUSA") assigned to this case. The letter states in relevant part:

This letter is to advise you of information which has very recently come to my attention which may, to some extent, be exculpatory material as defined by *Brady v.*

*Maryland,* 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963) or *Giglio v. United States,* 405 U.S. 150 [92 S.Ct. 763, 31 L.Ed.2d 104] (1972). Apparently, Detective Linda Draeger was another officer present during the contact with John Steele inside of the farmhouse after he was taken into custody. Her perception or recollection regarding the interview of Mr. Steele by Sergeant Mark Bradley and Drug Enforcement Administration Special Agent Jerry Becka may differ from some of the other testimony offered during the suppression hearings which related to that contact and interview of Mr. Steele. We do not have any reports or written statements from Detective Draeger that either existed at the time of the trial of this case or that exist now. This information has only come to my attention by oral communication. If you wish to know what, if any, information Detective Draeger may have with regard to the interview with John Steele, you will need to contact her directly.

According to Steele, the "new evidence" delineated in the letter may be consistent with his testimony at the pretrial hearing, and affect the district court's decision that he obstructed justice. Severson argues that the information may also benefit him, and because neither he nor the court know what the detective's testimony might be, the matter of his sentence must be remanded for a hearing. (Defendants' motions for judicial notice at 1). Neither defendant argues that a new trial is required in light of the as-yet unknown testimony by Detective Draeger, nor do they argue that the detective's testimony would in any way affect the decision not to suppress evidence.

■■■■ In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that exculpatory information suppressed by the government, without regard to the government's good faith efforts to produce such evidence, violates a defendant's due process right to a fair trial. *Id.* at 87, 83 S.Ct. at 1196. The Supreme Court held in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), that any material evidence which might un-

dermine the reliability of government witnesses must be turned over to the defendants. "[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." *Id.* at 154, 92 S.Ct. at 766. Due process also requires a defendant receive a fair sentencing hearing. *United States v. Radix Lab., Inc.*, 963 F.2d 1034, 1039 (7th Cir.1992). The amount of "process" required in the sentencing hearing is not as great as that required in the trial itself. *Id.* Nonetheless, *Brady* applies to sentencing.

The AUSA appropriately informed the defendants of the potential *Brady* and *Giglio* evidence when he learned of it. But despite his good intentions, neither this court nor the defendants know the significance of that information. Because of the possibility of injustice, the defendants' sentences on these issues must be reconsidered in light of the new evidence. *Radix*, 963 F.2d at 1040. Although the letter names only Steele, we do not know whether the detective's testimony might affect Severson's sentence: if the detective offers information that supports one of Steele's statements, it might also support a similar statement to Severson's. For this reason, we remand the defendants' sentences to the district court for further fact-finding on this issue and its application to the obstruction of justice increase. Because the district court discussed the acceptance of responsibility denial together with the obstruction of justice increase, we also remand that issue for re-evaluation and clarification.

Our decision to remand for resentencing on these two issues does not affect the balance of the defendants' sentences under the Guidelines. Formerly, district judges retained broad discretion to fashion sentences and a remand on certain aspects of the sentence might require remand for consideration of the entire sentencing package. *United States v. Shue*, 825 F.2d 1111, 1113 (7th Cir.), *cert. denied*, 484 U.S. 956, 108 S.Ct. 351, 98 L.Ed.2d 376 (1987) ("Because the sentences are inter-dependent, the reversal of convictions underlying some, but not all, of the sentences renders the sentencing package ineffective in carrying out the district court's sentencing intent as to any one of the sentences on the affirmed convictions."). *See United States v. Pimienta–Redondo*, 874 F.2d 9, 14 (1st Cir.) (*en banc*), *cert. denied*, 493 U.S. 890, 110 S.Ct. 233, 107 L.Ed.2d 185 (1989) (when one or more counts is removed from the sentencing package, district court must redefine the package's size and shape in light of those withdrawals). The Sentencing Guidelines brought a formulaic method to sentencing, eliminating much of the district court's discretion and altering the idea of a "sentencing package". This fixed scheme of sentencing avoids the need to remand for reconsideration of every aspect of the defendants' sentences. Moreover, the convictions stand. For that reason, only the portions of the sentence that are affected by the new evidence should be considered.

### B. Steele's Claims:

#### 1. Minor participation:

 Steele claims that, at most, he was a minor participant in the overarching conspiracy, and his sentence should have been reduced pursuant to § 3B1.2(b) of the Sentencing Guidelines. We disagree. After reviewing the district court's decision to determine if it was clearly erroneous, *United States v. Scroggins*, 939 F.2d 416, 423 (7th Cir.1991), we affirm the decision not to reduce Steele's sentence for minor participation. Steele's home was used as the division and distribution center for the marijuana. He contacted a network of buyers for the marijuana, who came to Steele's home to do business. The district court's determination that Steele was more than a minor participant in the marijuana conspiracy was not clearly erroneous.

#### 2. Due process:

 Steele's final challenge to his sentence is that the district court was overly harsh when sentencing him because he chose to have a jury trial rather than pleading guilty and continuing to cooperate with federal agents. We review sentences that fall within the maximum term provided by Congress for a manifest abuse of discretion. *United States v. Marren*, 890 F.2d 924, 937 (7th Cir.1989). The district judge stated:

I think it is horribly unfortunate that Mr. Steele and Mr. Severson chose rather than

to continue the co-operation they engaged in when they were first arrested, to change their stories, to refuse to cooperate, to lie on the stand, to lie in affidavits. The result is going to be extremely harsh. At a minimum, you are looking at a sentence that is twice as long as it might very well have been if you continued to cooperate.

(Sent.Tr. at 25). The district court's statement illustrates that it was not simply the withdrawal of his cooperation, but his decision to change his story and lie under oath that resulted in a sentence far more severe than if the cooperation and truthfulness had continued. Moreover, a sentence without the insulation of a plea agreement would reflect the harsh penalties for drug crimes under the Sentencing Guidelines. The district court did not abuse its discretion when it sentenced the defendants to a term within the appropriate Guidelines range. *See United States v. James*, 923 F.2d 1261, 1269 (7th Cir.1991) (lighter sentence imposed on co-conspirator who pleaded guilty is insufficient evidence to support theory that defendant who received heavier sentence was punished for going to trial).

*C. Severson's Claim:*

*1. Prosecutorial misconduct:*

■ During the government's rebuttal argument, the prosecutor told the jury that the government's only objective was to bring the truth before the jury, that Kaltenberg's plea agreement required him to testify truthfully against the defendants, and that the government would not tolerate untruthful testimony. The defense objected to the statements as an improper vouching for the government's witness. The district court sustained the objection, and directed the jury that it was their duty, not the prosecutor's, to determine the credibility of the witness. (Tr. v. 23 p. 3).

■ The government may not vouch for the credibility of its own witnesses. *United States v. Spivey*, 859 F.2d 461, 466 (7th Cir.1988). To evaluate a prosecutorial misconduct claim, we examine the conduct in

two steps. First, we review the remark in isolation to determine if it was proper. If the statement was improper, we move on to step two, and consider several factors to decide if the prosecutor's statement violated the defendant's right to a fair trial. We consider the nature and seriousness of the statement; whether the statement was invited by the conduct of defense counsel; whether the district court sufficiently instructed the jury to disregard such statements; whether the defense could counter the improper statement through rebuttal; and finally, whether the weight of the evidence was against the defendant. *United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir.1993). We will reverse only if the prosecutor's statement was not harmless beyond a reasonable doubt. *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

We need not split hairs over the propriety of the prosecutor's statement, because even if it was improper, it was harmless. The factors in step two of the inquiry weigh in the government's favor. First, the government claims that the prosecutor's remark was invited by the defense. During his closing argument, Severson's attorney stated that Kaltenberg was facing a 5–40 year prison sentence, and that his only hope of avoiding that sentence was to help make a case against Severson. He further stated "the government made much of the fact, 'Well isn't it true, Mr. Kaltenberg, that you have to tell the truth after you've entered into this agreement.' 'Oh, yes, yes.' " (Tr. v. 25 p. 8). During rebuttal, the prosecutor's disputed remark was "the plea agreement from Tom Kaltenberg does not say you will get credit and good recommendations if you testify, just testify against other people involved, but only if you testify truthfully, and if you, in fact, testify untruthfully, even if it benefits the government in some way, the government won't tolerate it." (Tr. v. 23 p. 3).

If the defense struck the first blow, and the prosecutor tries to right the scale with a reasonable remark, the statement will not warrant reversal. *Young*, 470 U.S. at 13, 105 S.Ct. at 1045. Here, defense counsel's remarks come very close to inviting the prosecutor's comments by insinuating that the wit-

ness was lying to receive the benefits of the plea agreement. Nonetheless, because the lawyer was tossing neither horseshoes nor hand grenades, very close does not count. The prosecutor's remark was not invited. But the lack of invitation does not render the trial unfair. We have held that it is not improper for the government to point out that a plea agreement provides the defendant with a motive to testify truthfully. *Spivey*, 859 F.2d at 466. We believe the prosecutor's statement here was little more than that. Moreover, the district court immediately instructed the jury that the prosecutor's statement was improper, and that it was the jury, not the prosecutor, who decided the credibility of the witnesses. We rely on our belief that juries heed the instructions. *United States v. Neely*, 980 F.2d 1074, 1085 (7th Cir.1992). Although the defense did not have an opportunity to counter allegedly improper vouching through surrebuttal, the weight of the evidence was strongly against Severson. Many witnesses, both co-conspirators and government agents, testified to Severson's role in the conspiracy. Some of that testimony was supported by audio taped conversations. We believe that the prosecutor's statement was harmless error beyond a reasonable doubt.

Severson also complains that the prosecutor improperly inflamed the jury's passion by asking for the preservation of civil order. The prosecutor stated "Every person in this country who commits a crime is a citizen, is just a mere citizen, but they're a citizen who broke the law. We have laws to have standards to guide our conduct, protect our property, and the police are out there to enforce that—those laws to protect." (Tr. v. 23 p. 5). The defense objected, and the district court sustained the objection. Comments that invite conviction for reasons other than because the defendant was proven guilty beyond a reasonable doubt are improper. *Badger*, 983 F.2d at 1456. The government relies on step two of the analysis to illustrate that Severson was not denied a fair trial. The government argues that the comment was invited by the defense, but does not point us to any statement in the record that could be construed as an invitation. Nor does our review reveal an inviting re-

mark. Although it loses on that point, the government wins because of the other considerations encompassed within step two. First, we do not believe that statement was particularly inflammatory; we do not believe it incited the jury to deliver a guilty verdict without proper consideration of the evidence. Second, although the district court did not immediately instruct the jury to disregard the remark, we believe the district court's later charge to the jury sufficiently cautioned them to consider the evidence presented at trial, not the comments of the attorneys. (Tr. 5–B–3). And again, the weight of the evidence clearly was against Severson. We believe that Severson was not denied a fair trial by virtue of the prosecutor's remark. *See Badger*, 983 F.2d at 1456 (prosecutor's comment asking jury to "send a message" to criminals was improper, but not so inflammatory as to prejudice the defendant).

### III.

The defendants' convictions are AFFIRMED. The defendants' sentences are VACATED and REMANDED for further proceedings and reconsideration of the sentences based on the matters raised in this opinion.